## CHAS. B. COOPER AND WIFE, Respondents, v. COMMONWEALTH TRUST COMPANY, Appellant.

**St. Louis Court of Appeals. Argued and Submitted April 5, 1909; Affirmed May 24, 1909; Re-hearing Granted July 20, 1909; Re-argued and Submitted October 4, 1909; Opinion Filed October 19, 1909.**

1. **AGENCY: Bailments: Conversion by Agent or Bailee.** A bailee or agent cannot deal with the property of the bailor or principal in any way by which the owner's title will be divested. And, in case of tortious conversion by such bailee or agent, any person receiving a benefit thereunder would be liable for the value of such property, or responsible for money had and received.

2. **ADMISSIONS: Evidence: Party Bound by His Own Testimony.** The appellate court is bound by the record a party to a suit has made by his own testimony, and will not treat a statement made by him on the witness stand as a mere inadvertency.

3. **AGENCY: Evidence.** Evidence *held* to show that persons who had negotiated for a loan with an association sent trust deeds and notes, executed by them to evidence the loan, to bankers as agents for the association, and not as their own agents.

4. **CONVERSION: Money Had and Received: Case Stated.** Plaintiffs who had negotiated for a loan with a loan association sent the notes and deed of trust, after executing them, to a bank as the agent of the loan association. Thereafter, the bank drew a draft on the loan association for the amount of said loan, with the notes and deed of trust attached, and sent it to defendant trust company, which credited the proceeds thereof to said bank and allowed it to draw against the same. The defendant trust company collected the amount of the draft from the loan association and delivered to it the notes and deed of trust attached to the draft, and the latter continued to hold the same. No part of the proceeds of said loan was paid to plaintiffs, and they brought an action against the trust company for money had and received. *Held,* that when plaintiffs delivered the notes and deed of trust to the bank, as the agent of the loan association, their title to them passed, and that while the failure of the defendant trust company to pass the money on to plaintiffs might raise a question between it and the loan association, it does not give plaintiffs a right of action against defendant for money had and recovered or for conversion, as the owner of the note alone could maintain such actions.

Appeal from St. Louis City Circuit Court.—*Hon. Matt G. Reynolds,* Judge.

REVERSED.

*Bryan & Christie* for appellant.

(1) Plaintiffs' action cannot be maintained. The money which was received by defendant was not *ex aequo et bono* the money of the plaintiffs and was not received at the time for plaintiffs' use. Campbell v. Wilson, 13 D. C. 497; Monday v. Siler, 47 N. C. 389. (2) (a) The deposit of the draft by Salmon & Salmon with the Commonwealth Trust Company, defendant, and the crediting of the same by defendant to Salmon & Salmon as cash, in accordance with the usual practice existing between the parties, constituted an immediate transfer of the draft to the defendant, and defendant thereby became the bona fide holder for value of the draft, and when the defendant transferred and sold the draft to the First National Bank of Kansas City the proceeds of such sale became the absolute property of defendant, and plaintiffs had no rights in the same. Ayers v. Bank, 79 Mo. 421; Flannery v. Coates, 80 Mo. 444; Kavanaugh v. Bank, 59 Mo. App. 540; Burton v. United States, 196 U. S. 283; Morse on Banks and Banking (4 Ed.), sec. 580, also secs. 573, 575; Hendley v. Refinery Co., 106 Mo. App. 20; Noble v. Doughten, 83 Pac. 1048, 3 L. R. A. (N. S.) 1167. (b) The fact that if the draft had not been paid, the defendant would have been entitled to charge it back to Salmon & Salmon did not in any way change the situation. Dymock v. Bank, 67 Mo. App. 97; Bank v. Roll, 60 Mo. App. 585; See also authorities cited in note 86, A. S. R. 781 and 796. (3) Even if the draft had been drawn by Salmon & Salmon in the names of the plaintiffs and as their agents, but without authority of the plaintiffs, yet, since plaintiffs seek now to recover the proceeds of that draft, they must be held

to have ratified the action of Salmon & Salmon in drawing the same. "A principal cannot accept and appropriate the fruits and benefits of a contract made by his agent, and then controvert the authority of the agent to bind him by the agreement." Clark & Skyles on Agency, sec. 142, pp. 355 *et seq.*, and cases cited; also page 329, sec. 140e; Fahey v. Grocery Co., 57 Mo. App. 73; Norton v. Bull, 43 Mo. 113; Watson v. Bigelow, 47 Mo. 413; Bank v. Lumber Co., 54 Mo. App. 327; Bank v. Lumber Co., 102 Mo. App. 75. (4) Since plaintiffs have ratified the action of Salmon & Salmon in undertaking to close the loan, they must be held to have ratified the transaction as it was done. They cannot ratify the part which may be to their advantage, without also ratifying that part which may be to their disadvantage. Porter v. Woods, 138 Mo. 539; State ex·rel. Laupheimer v. Harrington, 100 Mo. 170; Clark & Skyles on Agency, pp. 355 *et seq.*, sec. 142; Mechem on Agency, sec. 130; Shinn v. Mule Co., 109 Mo. App. 557; Menkens v. Watson, 27 Mo. 163; Horse Co. v. Bennett, 52 Mo. App. 333; Watson v. Bigelow, 47 Mo. 413. (5) Particularly is this true where the contention of plaintiffs is that Salmon & Salmon had no original authority in the premises. State ex rel. Laupheimer v. Harrington, 100 Mo. 170; Menkens v. Watson, 27 Mo. 163; Shinn v. Mule Co., 109 Mo. App. 557. (6) Where a bill of exchange has been acquired by one in good faith and for value, he cannot be called upon to account for the money received by him from the collection or sale of the same upon a claim that in transactions between the drawer and third persons there has been some fraud or mistake. Spaulding v. Kendrick, 172 Mass. 71; Southwick v. Bank, 84 N. Y. 420; Bank v. New York, 141 N. Y. 379; Newhall v. Wyatt, 139 N. Y. 452; Insurance Co. v. Abbott, 131 Mass. 397; Aiken v. Short, 1 Hurlstone & Norman's Reports, 209; Bank v. Berrall, 66 L. R. A. 599; Keener on Quasi Contracts, p. 77.

*E. C. Crow* and *John A. Gilbreath* for respondent.

The "Act" of Salmon & Salmon, through Thomas M. Casey, cashier and general manager, was unauthorized, wrongful, fraudulent and tortious and passed no title to the Commonwealth to the bonds, coupons and note thereto, attached; and the collection, retention and appropriation of the proceeds and value thereof, in amount of $3000 with interest at six per cent, from the date of reception and notice of demand to the Commonwealth Trust Company, the defendant, was likewise unauthorized, wrongful and tortious, as against Charles B. and Lena M. Cooper, plaintiffs, the actual and real owners; and for which the defendant is liable in an action of money had and received. An action for money had and received will lie and is the proper remedy. Floyd v. Wiley, 1 Mo. 430; Floyd v. Wiley, 1 Mo. 643; Johnson v. Strater and Thompson, 3 Mo. 359; Gordon v. Bruner, 49 Mo. 570; Tann v. Kellogg, 49 Mo. 118; Bank v. Rawls, 50 Am. Dec. 394; Allen v. McMangle, 77 Mo. 478; Williams v. Wall, 60 Mo. 318; State v. Berning, 74 Mo. 87; Johnson v. Bank, 116 Mo. 568; Richardson v. Drug Co., 92 Mo. App. 515; Pipkin v. Loan Co., 80 Mo. App. 6; York v. Bank, 105 Mo. App. 127; Antonelli v. Basill, 93 Mo. App. 138; Deal v. Bank, 79 Mo. App. 262; Clark v. Bank, 57 Mo. App. 286; Johnson v. Bank, 56 Mo. App. 257; Harrison v. Murphy, 106 Mo. App. 473; Crane v. Murray, 106 Mo. App. 702; Crigler v. Duncan, 121 Mo. App. 392; Hall v. Marston, 17 Mass. 574; 2 Greenleaf on Ev. (16 Ed.), sec. 117; Banking Co. v. Com. Co., 195 Mo. 262.

STATEMENT.—Salmon & Salmon, a co-partnership, were private bankers at Clinton, Henry county, Missouri, Thomas M. Casey being the cashier and acting manager of their bank. On Wednesday, June 21, 1905, this bank failed and was on that day taken in, charge by the secretary of state of Missouri and placed

in the hands of a receiver. Subsequently, upon the petition of the creditors thereof, it was adjudged bankrupt by the United States Court.

The Missouri Savings Association, also referred to as the Missouri Savings Association Bank or as "The Bank," and meant when hereafter referred to as the Association, was a Missouri corporation, doing business in Kansas City, Missouri, and engaged in making loans on farm lands in this State and elsewhere. W. S. Webb was the vice-president and cashier of that Association, he and the Association having their offices in Kansas City. Otto Seigle was engaged in the lumber business at Clinton and was also a local agent or solicitor there for the Association, engaged in soliciting and procuring farm loans for it. His course of business under his employment appears to have been, that when applied to for loans, to have the applicant sign a written application for the loan, addressed to the Association, and forward the application to that institution at Kansas City, whereupon Mr. Webb, acting for the Association, would examine the application and inspect the property offered as security for the loan. Upon his return to the office of the Association at Kansas City, the loan was approved or disapproved, as the case might be. The Commonwealth Trust Company, defendant and appellant, is a trust company in the city of St. Louis, doing a general trust company business, including the buying and selling of commercial paper and receiving deposits. The First National Bank of Kansas City is a national bank, doing business in Missouri and located at Kansas City in that State, and a correspondent there of the Commonwealth Trust Company of St. Louis. The Mutual Benefit Life Insurance Company is a life insurance company, making farm loans in this State and represented at St. Joseph, Missouri, by Bartlett Brothers. Charles B. Cooper and Lena M. Cooper, his wife, plaintiffs and respondents here, own a farm of one hundred and sixty acres in St. Clair county, this

State, some twenty or twenty-six miles from Clinton. In the year 1904, Cooper and his wife had executed a deed of trust securing a note for $1500 on this one hundred and sixty acre tract, the note and deed of trust being in favor of the Mutual Benefit Life Insurance Company, which note matures on April 1, 1909. This deed of trust was duly recorded. Bartlett Brothers were handling this loan for the Life Insurance Company. Desiring to pay off and discharge this loan and also to raise additional money on his land, Cooper, according to his own testimony and to the testimony of Seigle, went to Seigle at Clinton, as the representative there of the Missouri Savings Association, and asked him for a loan of $3000 on his land. Whereupon Seigle, representing the Missouri Savings Association and acting for it, as the testimony shows beyond any dispute, took Cooper's application and sent it in to the Missouri Savings Association. To state the transaction in Seigle's own language, "Why, Mr. Cooper came to me for a loan of $3000 on his land and I took his application and sent it in just like I do all of them and it was accepted by the company and they sent the papers down to me, which they always do." This application appears to have been signed by Cooper and by him sent to Seigle at Clinton and forwarded by Seigle to the Missouri Savings Association at Kansas City. The written application is addressed to the Missouri Savings Association and applies for a loan of $3000 for six years, to bear interest at the rate of 8 per cent per annum, payable semi-annually, Cooper agreeing to secure the same by notes and mortgages or deeds of trust in the usual form of the Savings Association, which should be a first lien on the real estate described, he agreeing to furnish the Missouri Savings Association with an abstract of title to the property from the United States down to and including the mortgage and deed of trust to be given to the Association, and to pay the expenses incurred by the

Association in perfecting title and recording fees and to take the money at any time within thirty days; also agreeing that if the Savings Association negotiated the loan at a less rate than 8 per cent, to make his note in favor of the Association for the difference between that rate and the rate at which the loan was negotiated, this latter amount to be payable in six installments, corresponding with the interest payments on the loan and to secure it by a second mortgage or deed of trust on the same property. The agreement in terms constituted the Missouri Savings Association, under the name of "Missouri Savings Association Bank," the agent of Cooper to procure the loan for him and it authorized that Association to pay the proceeds of the same "to my said agent, and whatever incumbrances the abstract shows upon said premises you are hereby authorized to pay to the party holding the record title thereto as shown by said abstract." It appears that after his preliminary negotiation with Seigle, Cooper and his wife had gone to Wagoner, in the then Indian Territory, and were residing there from that time on, Mr. Cooper apparently not returning to Clinton until sometime after the 21st or 22nd of June, 1905, and the written application referred to, as well as the deeds of trust and notes, were signed and executed by the Coopers at Wagoner. After receipt of this written application at its Kansas City office, to which place it had been forwarded by Seigle, Mr. Webb went down to St. Clair county, Missouri, inspected the farm, approved the loan, prepared the two deeds of trust, the note or bond, as it is called, and the coupons and forwarded them to Seigle. Seigle, upon receipt of the papers, sent them to Cooper, at Wagoner, accompanied by a letter instructing him to execute them and return them to the Salmon & Salmon bank at Clinton. This letter of instruction was not produced in evidence and plaintiff Cooper testified that so far as he knew it was not in existence. Seigle testified that he had no copy

of this letter and that all the instructions contained in it were for Cooper to send the papers back to the Salmon & Salmon bank. Cooper testified that after he received these papers he held them for some time, then signed them and returned them to the Salmon & Salmon bank, as instructed by Mr. Seigle and that he also wrote that day to Salmon & Salmon, that he had sent the papers under the instruction of Mr. Seigle to their bank. Cooper testified that he had no copy of this letter of transmittal to Salmon & Salmon, nor was the original produced, but he testified that all that was in it was merely that "inclosed they (Salmon & Salmon) would find the deeds of trust and papers for the loan which he (Cooper) had made with the Missouri Savings Association Bank and that he had sent them to Salmon & Salmon under the instruction of Mr. Seigle." He further testified that on the same day he had written to Mr. Seigle, which letter was neither produced nor a copy of it in evidence, but was mailed at Wagoner, Indian Territory, June 16, 1905, and that the substance of the letter was that he "had returned the papers which he (Seigle) had sent him to the Salmon & Salmon bank, as he (Seigle) had instructed him to do." The envelope in which the letter was said to have been contained was produced, the letter itself, however, was not. After testifying in chief to having sent these papers, accompanied by a letter, to Salmon & Salmon, and also writing to Seigle to the effect that he had done so and that he had never received any money from anybody in the transaction and had never authorized Salmon & Salmon to collect the money for him or to draw any draft, and that the prior deed of trust had not been paid off, plaintiff Cooper, in cross-examination, reiterated that he had made the application for the loan through Seigle and in sending the papers to Salmon & Salmon had been acting under the direction of Seigle. He was asked whom he understood Seigle to represent in the matter

and he answered that he understood Seigle to represent the Missouri Savings Association Bank.   His attention was then called to this clause in his application for the loan:   "I hereby appoint Missouri Savings Association Bank my agent to procure the loan for me, and authorize you to pay the proceeds of the same to my said agent," and he was asked if he had appointed the Missouri Savings Association his agent in this matter.   He answered, "Yes."   Asked if Mr. Otto Seigle was the agent of the Missouri Savings Association, he said, "Yes."   Asked if he had authorized Salmon & Salmon to draw a draft for that money, he said he had not. Asked when Salmon & Salmon drew that draft, whether they were acting as his agents according to his theory of the case, he answered, "They were not."   Asked when Salmon & Salmon received any money on that draft, if they were not acting as his agents according to his theory, he answered, "They were not."   Asked why he sent the bond and note to Salmon & Salmon bank, he said that he did that because he was instructed to do so by Mr. Seigle.   He was asked if he had not been the plaintiff in two other suits in connection with this same matter, and he answered, "Yes, sir, I guess so."   These questions and answers, in fact Cooper's whole testimony, appear in the transcript and in the supplemental abstract furnished us by attorneys for the respondents. We give the following verbatim, taken from that abstract, as questions asked and answers given by plaintiff Cooper on cross-examination:

"Q.   You have been plaintiff in two other suits in connection with this matter, have you not, Mr. Cooper?   A.   Yes, sir, I guess so.

"Q.   In one of these suits you and your wife joined with the Missouri Savings Association and brought suit against Mr. Egger, as receiver for the Salmon & Salmon Bank, did you not?   A.   Yes, sir.

"Q.   On what theory did you expect to recover the money from the Salmon & Salmon Bank?

"Mr. Crow: I submit that is hardly a fair ques-
tion to ask him. You might ask him why he did it.

"Mr. Bryan: Well, why did you do it? That is
the same question. A. Well, the only reason I can give
was through the instructions of my attorney.

"Q. I believe you brought another suit relative to
this same transaction, did you not? A. Yes, sir.

"Q. That second suit you and your wife sued the
Missouri Savings Association, didn't you? A. Yes, sir.

"Q. The Commonwealth Trust Company and the
First National Bank of Kansas City? A. Yes, sir.

"Q. In this petition, I will call your attention to
the fact that you state that those papers were for-
warded to the Salmon & Salmon Bank, as agents of the
Missouri Savings Association? A. Yes, sir.

"Q. Is that a fact? A. How was that?

"Q. That those papers—the notes and the bond
and the deed of trust—were forwarded to Salmon &
Salmon as agents for the Missouri Savings Association?
A. They were forwarded to Salmon & Salmon.

"Q. Yes, as agents of the Missouri Savings Asso-
ciation? A. Yes, sir."

It appears by the evidence in the case that these
papers, apparently mailed about the 16th of June, at
Wagoner, addressed to Salmon & Salmon, at Clinton,
reached the latter place on Saturday, June 17, 1905.
They consisted of one note for $3000, payable to the
Missouri Savings Association or order, June 1, 1911,
with interest at the rate of five per cent per annum,
interest payable semi-annually, as evidenced by twelve
coupons attached and expressed to be for value re-
ceived, and one note for $545, payable to the Missouri
Savings Association or order in twelve installments.
Attached to the $3000 note were interest coupon notes,
payable to bearer. The notes as well as the coupons
were dated May 15, 1905, and were negotiable, and it
was stated in each of them that they were secured by
a deed of trust or mortgage on real estate in St. Clair

county, Missouri. The notes and coupons were signed by Charles B. Cooper and Lena M., his wife. The $3000 note and its coupons were secured by what was intended to be a first mortgage on the real estate in St. Clair county, and the $545 note was also secured by a deed of trust, which was intended to follow the first one, on the same property. The deeds of trust, executed to Webb as trustee for Missouri Savings Association, securing these notes, were also inclosed. It will be noted, therefore, that the Missouri Savings Association elected to take the loan itself, or in its own name.

On receipt of the deeds of trust, notes and coupons on that morning of the 17th, which was Saturday, Casey, in the name of Salmon & Salmon, on the same day transmitted the deeds of trust to one Rodgers, at Osceola, the county seat of St. Clair county. Rodgers was an abstracter of titles, and Casey, in the letter of transmittal, instructed him to file the deeds of trust for record and make a supplemental abstract to the land covered by them, beginning with the deed of trust in favor of the Mutual Benefit Life Insurance Company. These papers appear to have reached Rodgers on the afternoon of that Saturday, the 17th, on which afternoon they were placed of record, the $3000 one ten minutes before the one for $545. A supplemental abstract made by Rodgers, was placed in the mail that Saturday night, directed to Salmon & Salmon at Clinton. It reached Salmon & Salmon at Clinton, about noon on Sunday, June 18th.

Seigle had testified that there was some delay in the sending on of the papers by Cooper to Salmon & Salmon, and he had several times asked Casey if they had arrived. Beyond this and prior to the arrival of the papers, there is no evidence whatever in the record to show that Seigle had ever said anything to Casey about the papers or what instructions, if any, he had given Casey concerning them. He testifies that he was not in Clinton on Saturday, the 17th, and that after

the receipt of the papers by Casey, the latter called
him (Seigle) up over the telephone, Seigle being at his
farm out in the county, and told him that he was going
to draw a draft and wanted to know if he (Seigle)
thought the Missouri Savings Association Bank would
turn down these papers, and he (Casey) wanted him
(Seigle) to come up and sign them himself, but he
(Seigle) told Casey he would not do it.  The next time
that Seigle met Casey was the following Monday or
Tuesday, at any rate before the bank finally closed,
which was Tuesday night about 4 o'clock, its usual clos-
ing hour.  It did not re-open on Wednesday.  What-
ever day it was and it was one or the other of these
days, and before the bank was closed out, Seigle came
back from his farm and had a conversation with Casey,
at Clinton, who asked him if he thought the draft would
be turned down by him (Casey) signing it, and Seigle
told him that "that wasn't the way we done business;
that the borrower signed them; that Mr. Webb sent
him (Seigle) the drafts to pay off that mortgage with
the one ahead of it and to pay Mr. Cooper the other
one."  These two conversations, the one over the tele-
phone and the other in person, between Seigle and
Casey are the only conversations testified to by any one
as having taken place between them concerning the
transaction, and this is all we have of those conversa-
tions, except that further Seigle testified that when he
met Casey in the bank Monday or Tuesday, Casey told
him that he had drawn the draft and had sent on the
papers.  He had then drawn the draft and sent on the
papers to the Commonwealth Trust Company.  Seigle
also testified that he had not communicated to the Mis-
souri Savings Association anything about Casey going
to draw the draft; made no objection to Casey drawing
it, "didn't understand it that Casey was referring to
a draft drawn by Salmon & Salmon."  What Casey
wanted him (Seigle) to do was to sign Cooper's name
to the draft, and he "wouldn't do it; didn't know then

what Casey was going to do; didn't care what he had done after that, as long as he (Seigle) wasn't going to do it." But understood on Monday that Casey had drawn a draft, "simply because Casey had told him so."

On Sunday, the 18th of June, and on receipt of the supplemental abstract, Casey, in the name of Salmon & Salmon, wrote and mailed the following letter to Webb, cashier of the Missouri Savings Association, dating it, however, June 17th:

"Clinton, Missouri, June 17, 1905.
"W. S. Webb, Cashier,
          "Kansas City, Missouri.

"Dear Sir: We send you herewith supplemental abstract of title to real estate covered by your loan of $3000 to Mr. Charles B. Cooper. This is done at the request of Mr. Seigle. We have drawn on you for $3000 on account of this loan, attaching to draft a $3000 bond and commission notes, out of which we will pay off the Bartlett or rather the Mutual Benefit Life Insurance Company loan. The draft for three thousand dollars will not be presented until Tuesday, hence if you prefer to take up said loan yourself, please call us up tomorrow, or rather Monday, at our expense, and we will remit you to cover said loan.

"Yours very truly,
          "SALMON & SALMON.
                    " 'C.' "

This letter was received by the Missouri Savings Association at Kansas City, on Monday morning, June 19th, and with it the supplemental abstract, but that Association neither telephoned nor wrote to Salmon & Salmon or Casey in response to it. While this letter is dated June 17th, it could not have been mailed before the 18th, that is to say, Sunday. It inclosed the supplemental abstract, and that supplemental abstract had not been received by Salmon & Salmon or Casey until the afternoon of Sunday, the 18th. It was un-

doubtedly written on the 18th. Casey, in the name of Salmon & Salmon, drew this draft:

> "Customer's Draft.
> "$3000.00                 Salmon & Salmon, Bankers.
>                         "Clinton, Mo., June 17, 1905.
> "Pay to the order of ourselves three thousand dollars for attached papers, and charge to account of
> "To Missouri Savings Bank,     SALMON & SALMON.
> "Kansas City, Mo."

This was endorsed on the back, "Pay any bank or banker or order. All prior endorsements guaranteed. Salmon & Salmon, Bankers." This draft, dated the 17th, along with the notes attached, was mailed by Casey, in the name of Salmon & Salmon, to the Commonwealth Trust Company at St. Louis, on Sunday evening, June 18th, and was received by the Commonwealth Trust Company Monday, June 19th, although the Trust Company's receiving stamp bears date the 18th.

When the Commonwealth Trust Company received the draft with attached papers, it with other drafts and miscellaneous credits was placed to the credit of Salmon & Salmon by the Commonwealth Trust Company to the amount of $798.58. The total amount remitted by Salmon & Salmon of date June 17th, including the draft for the $3000, amounted to $5437.05, the remittance outside of the $3000 draft being made up of express orders, exchange and various smaller items. The Commonwealth Trust Company having carried the amount in it to the credit of Salmon & Salmon, June 19th, allowed them to draw on it that day, not only for the $798.58 credit with which their account had that day opened, but for an amount in excess of that and of the deposits received during the day, so that at the end of the day Salmon & Salmon's account with the Commonwealth Trust Company was overdrawn to the amount of $1331.81. On the same day the Commonwealth Trust Company attached the $3000 draft to the

commission note and the $3000 loan note and its coupons and indorsed the draft, "Pay to the order of First National Bank, Kansas City, Missouri. All prior indorsements guaranteed. Signed Commonwealth Trust Company, St. Louis, Mo., by J. M. Wood, Secretary," and transmitted the draft and attached papers, as well as other exchange items, to the First National Bank at Kansas City, Missouri. The draft with papers attached to it, as well as the other items, reached the latter bank on Tuesday and that bank presented the draft and its attached papers on that day to the Missouri Savings Association, which latter paid the draft and retained the notes and coupons. The First National Bank of Kansas City thereupon carried the proceeds of the draft to the credit of the Commonwealth Trust Company that day and on that day so advised the Commonwealth Trust Company by letter or postal. As before noted, on the evening of the same day, that is Tuesday, June 20th, and at the usual hour for closing the bank, 4 o'clock, Salmon & Salmon closed their doors. On the succeeding day, June 21st, the bank was taken possession of as also before stated by the banking department of the State. This fact became generally known on the forenoon of that day and the Missouri Savings Association officers learning of it, called up Bartlett Brothers, of St. Joseph, Mo., who, representing the Life Insurance Company, held the $1500 incumbrance, to ascertain if Casey or Salmon & Salmon had paid off the loan. Being informed that they had not, the Missouri Savings Association telephoned to Seigle at Clinton, to see Cooper and to see what was to be done. Seigle telephoned that Cooper was not in Clinton. Whereupon the Missouri Savings Association asked the First National Bank of Kansas City to telephone the Commonwealth Trust Company to hold the money and not turn it over to Salmon & Salmon. This was done on this 21st day of June, both by telephone and telegram, in the latter, the First National Bank

stating that the Missouri Savings Association requested it to notify the Commonwealth Trust Company not to turn over the proceeds of the collection telephoned about that day, amounting to $3000, to Salmon & Salmon. This telegram was sent about noon. The same day the Missouri Savings Association telegraphed the Commonwealth Trust Company as follows: "Do not pay Salmon & Salmon $3000. Yours 19th to First National Bank obtained by fraud and misrepresentation; trust fund; have written;" and on that day the Missouri Savings Association wrote the Commonwealth Trust Company to the effect that the $3000 paid by the Missouri Savings Association to the First National Bank, Kansas City, on draft dated June 17, 1905, and drawn on Missouri Savings Association by Salmon & Salmon of Clinton, Missouri, "is not the property of said Salmon & Salmon and should not be paid to them or treated by you as their property." The letter then went on to state what were claimed to be the facts in the case, among other things setting out that the papers for the loan, that is to say the note and deeds of trust, were prepared by the Missouri Savings Association, sent by it to Seigle for execution; that Seigle sent them to Cooper, who, after executing them, "returned them to said Seigle, who delivered them to said Salmon & Salmon, as the agents of Cooper, to receive from us (Missouri Savings Association) the amount of the loan, to be applied, $1500 to said old deed of trust, and the balance for Cooper. That the draft above referred to for $3000 was drawn by Salmon & Salmon as a means of receiving from us the amount of said loan, as appears by the words, 'for attached papers,' in said draft—the attached papers being said notes and deed of trust, and we (Missouri Savings Association) paid the money on said draft as the money of said Cooper. That the said $3000 was and is not the property of Salmon &

Salmon but a trust fund belonging to said Cooper for the use above stated." After stating that they had wired the Commonwealth Trust Company not to pay the draft to Salmon & Salmon but to hold the money for Cooper, the letter adds: "in which ($3000) we also have an interest, because that under our agreement with Cooper, $1500 of it was to be applied to satisfy the first deed of trust now on said farm." The receipt of this letter was acknowledged by the defendant, accompanied by the statement that on the facts of the case as written to them by the cashier of the Missouri Savings Association, the Commonwealth Trust Company could see nothing upon which the Savings Association could base any claim as against funds which had been paid to the Commonwealth. There was uncontroverted testimony to the effect that the acts of the Commonwealth in crediting the draft to Salmon & Salmon as a cash item and allowing them to draw against it, were in the usual course of business.

The Missouri Savings Association, on presentation of the draft and notes and after payment of the draft to the First National Bank of Kansas City had kept and still retained possession of the notes and coupons and also holds the deeds of trust. It was in testimony that plaintiffs had never received anything from anybody on account of the transaction. The Commonwealth Trust Company declined to pay the $3000 to Cooper, and this present suit was instituted, the petition alleging "that defendant is indebted to plaintiffs in the sum of $3000 on account of money had and received by the defendant for the use of plaintiffs on the 17th day of June, 1905, and which sum of money defendant agreed to pay to plaintiff." Judgment is demanded for this $3000, with interest thereon from June 17, 1905, and for costs. The answer was a general denial. The trial was before the court, a jury having been waived, and the facts as here outlined given in evidence. At the close of plaintiff's evidence de-

fendant asked an instruction in the nature of a demurrer and renewed it at the conclusion of the trial. At the instance of the plaintiffs, the court gave the following declaration of law:

"If the court, sitting as a jury, believes and finds from the preponderance of the evidence that Charles B. Cooper and Lena M. Cooper, his wife, the plaintiffs, signed the bond and coupons and note, in amount, three thousand dollars, read in evidence, with the deeds of trust read in evidence, on the lands in St. Clair County, Missouri, to Watt Webb, as trustee for the use and benefit of the Missouri Savings Association of Kansas City, Missouri, and sent the same to Salmon & Salmon, bankers, at Clinton, Missouri, on or about June 17, 1905, without any directions, authority or request from plaintiffs to Salmon & Salmon, or to Thomas M. Casey, cashier, to negotiate the same or to collect the amount due thereon, or to otherwise collect, sell or dispose of the same; and that the said Salmon & Salmon, or Thomas M. Casey, cashier thereof, without payment consideration, and without authority, direction or request or consent, did cause the deed of trust to be recorded, and that he or said Salmon & Salmon, without payment and consideration, authority, request, or knowledge or consent of plaintiffs drew a draft for three thousand dollars on the Missouri Savings Association, signed, Salmon & Salmon, payable to Salmon & Salmon, for attached papers, and attached the bond, coupons and note, read in evidence, to the draft aforesaid, on the 17th day of June, 1905, and sent the draft and attached papers aforesaid to the Commonwealth Trust Company of St. Louis, the defendant, and that the draft and attached papers were by the defendant forwarded to the First National Bank of Kansas City, Missouri, for presentation and payment, without the knowledge, authority, direction or request of plaintiff; and that the said last mentioned bank did present the draft and attached papers to the Missouri Savings As-

sociation on June 20, 1905, and did then and there receive payment in the sum of three thousand dollars and delivered the draft and attached papers to the Missouri Savings Association, without the knowledge, authority, directions or request of plaintiffs, and that the First National Bank then and there remitted the proceeds, or its equivalent, so received, in amount, three thousand dollars, to the Commonwealth Trust Company, and that the same was so received by defendant, on June 21, 1905, without the knowledge, authority or directions of plaintiffs, and that the defendant has failed, refused and neglected to pay to the said plaintiffs the said sum of three thousand dollars, or any part thereof, upon demand, but has retained, appropriated, and kept the same ever since the reception thereof, then the plaintiff is entitled to recover, and your verdict will be for plaintiffs in the sum of three thousand dollars, with six per cent interest from the date the same was collected and received."

In addition to the instructions for a nonsuit, defendant asked several instructions, all of which were refused. In the view we take of the case it is not necessary to notice these. There was a finding and judgment for plaintiffs and against defendant, for the whole amount claimed. After an unsuccessful motion for new trial the case has been duly appealed to this court by defendant, exceptions having been duly saved to the various adverse rulings and action of the court.

REYNOLDS, P. J. (after stating the facts).— When this case was first argued before us we arrived at the conclusion that the judgment of the lower court should be affirmed. A motion for rehearing having been filed, we sustained that and the case has been reargued and elaborately briefed by counsel. On full and careful reconsideration, we have arrived at the conclusion that our first determination of the case was erroneous.

If it is true that Salmon & Salmon were acting as the agents of the plaintiffs in the transaction and were authorized by them to send on the notes, collect the money on them and pay it over to them, then the theory so earnestly and ably advanced by counsel for respondents, that as bailees of any character or as agents for the plaintiffs, Salmon & Salmon could not deal with the papers in any way by which they could throw title to them out of plaintiffs or invest any person with any right under them, is correct. In a case of that kind Salmon & Salmon or their manager, Casey, would have been guilty of a tortious conversion, and any person receiving any benefit thereunder would be equally liable for the value of the securities converted, or responsible, as was claimed in this case by the petition in it, for money had and received. Such third party would be held to respond to the plaintiffs as for money had and received to their use and for their benefit. It was on this theory of the case that we all agreed in the affirmance of it when it was first presented to us. It was presented to us by appellants on the theory that the defendant was protected by dealing with commercial paper in the ordinary course of business. We declined to agree to that. That question does not arise and is unnecessary to be determined in the light of the case as disclosed by a more careful examination of the testimony in the case, particularly that of the plaintiff, Cooper, himself. He testifies in the most positive and unequivocal manner that Salmon & Salmon were treated with by him and recognized by him, not as his agents, but as the agents of the Missouri Savings Association, the very parties to whom the notes were payable and the very parties who were entitled to the possession of them and who were bound to pay them if they accepted and retained possession thereof. It was argued before us at the bar and is repeated in the very able briefs presented by the learned and industrious counsel for the respondents that the statement of

Cooper, when on the witness stand, that he considered Salmon & Salmon the agents of the Missouri Savings Association, was a mere inadvertent statement and that he did not mean to so testify. If that is so, it is very unfortunate for these plaintiffs. This court is bound by the record that he himself has made by his own testimony. He has testified in the most unequivocal manner that he delivered these papers, or mailed them, more correctly, to Salmon & Salmon, considering and treating the latter as representatives and agents of the Missouri Savings Association, and not as his agents. In point of fact a careful consideration of the testimony confirms this and demonstrates that the Missouri Savings Association itself, as well as Casey, the latter acting for Salmon & Salmon, so understood the matter. The letter which we have given at length in the statement of the case, from Casey to Webb, is the letter of an agent writing to his principal for directions as to what he shall do with the fund in the event that the draft is honored and it was full notice to the Missouri Savings Association that Salmon & Salmon proposed to act, not for the plaintiffs in the case, but for the Missouri Savings Association, in seeing to the payment of the prior incumbrance out of the $3000 for which the draft had been drawn. It is true that the Missouri Savings Association did not answer this letter either by letter or telephone, as requested to do in the letter, but they did not repudiate it, and it is in evidence that when they heard of the failure of the Salmon & Salmon bank, they at once got into communication with Mr. Bartlett, at St. Joseph, the man who held the note represented by the prior incumbrance, to ascertain from him whether or not Casey or Salmon & Salmon had paid off this prior incumbrance; which, in a measure at least, lends support to the view that they were up to then, satisfied to have Salmon & Salmon act for them in the transaction and were solicitous only to find out whether or not they had, with the proceeds of the draft,

lifted the prior incumbrance and cleared the land from that burthen. It was not until the Missouri Savings Association took up the matter with the Commonwealth Trust Company that it is suggested in any manner that they looked upon Salmon & Salmon as the agents of the plaintiffs in the transactions. In that letter, set out in the statement of the case, the proposition is for the first time advanced, that Salmon & Salmon were the agents, not of the Association, but of the plaintiffs. That came too late. We do not mean to hold that these acts of the Savings Association are binding on plaintiffs. They are, however, evidence of the light in which the Association regarded Salmon & Salmon and are confirmatory of the testimony of Cooper to the effect that Salmon & Salmon were agents of that Association and that he had so dealt with them. The acts of all the parties, prior to the time of the failure of the bank of Salmon & Salmon, which up to that time, so far as the evidence shows, enjoyed credit and was a going concern, clearly prove that all of them considered Salmon & Salmon the agents of the Missouri Savings Association in the transaction, and considered them the conduit through which not only the papers were to pass from the plaintiffs to the Missouri Savings Association, but more than that, the agents of that Association in the proper application of the money which was to be paid on the loan. It will not do, therefore, to say, under these circumstances, and in the light of the testimony, as the very earnest counsel for plaintiffs now do, that Mr. Cooper was mistaken and did not mean what he said, when he declared in that testimony that Salmon & Salmon were the agents of the Missouri Savings Association and that he so considered them at the time, and that he had never at any time considered them his agents in the transaction. When plaintiff delivered the notes and deeds of trust to Salmon & Salmon, according to his own sworn testimony, he delivered them to the agents of the Missouri

Savings Association as he had been directed to do. With that delivery his title to them passed out of him. The Missouri Savings Association received and, according to the testimony, still holds these papers. It remitted the money on the draft drawn against them, not to plaintiffs but to defendant, who was the person designated by the agent of the Association to receive it. If that party, the defendant here, failed to pass it on to plaintiffs, its failure to do so, while it might be a question between it and the Association, did not and does not give plaintiffs a right of action against it, either for money had and received or for conversion. If there had been a conflict in the testimony as to the question of whose agents Salmon & Salmon were in the transaction, it would have been the duty of the trial court to have declared that an issue of fact to be determined on the testimony. The declaration of law given at the instance of plaintiff ignored this and proceeded upon the theory that Salmon & Salmon were the agents in the transaction, not of the Missouri Savings Association but of the plaintiffs. While not expressly doing that in the instruction, the rule of law announced in it is sustainable upon no other theory. Looking at the facts in the case as developed by the evidence in it, there was no conflicting testimony on this point. It was all one way and positive to the effect that Salmon & Salmon, in the transaction, were the agents of the Missouri Savings Association and not the agents of the plaintiffs.

The acts of the defendant, on receipt of the draft and attached papers, so far as the evidence in the case shows, seem to have been in entire accordance with the usual banking custom. There was nothing irregular nor unusual in defendant crediting Salmon & Salmon with the draft as a cash item and whether it was warranted in so doing is another matter. As Salmon & Salmon, who drew that draft, were not, as we hold, the

agents of plaintiffs in so doing, these plaintiffs are not, in this case, concerned with that.

The owner of the notes alone can maintain action for conversion or for money had and received thereon. When the notes and deeds of trust were delivered by plaintiff Cooper to Salmon & Salmon, it was a delivery to the agent of the Missouri Savings Association, the party entitled to them. They then and thereafter became the property of the Missouri Savings Association. This did not affect the right of plaintiffs either to recover any sum due thereon, from the holder or owner of the notes, or to have them cancelled for non-payment, but it did extinguish their title to the notes as notes. Plaintiffs were no longer the owners after delivery to Salmon & Salmon and hence cannot recover.

It is due this court to say that when this matter was first argued and presented to us, this feature of the case upon which we now decide it was not presented by counsel or dwelt upon in such a way as to attract our attention, or to turn our minds to a consideration of the effect of this aspect of the case. For the reasons now stated, the judgment of the trial court is reversed. All concur.